GENERAL MANIFOLD & PRINTING CO. v. CARBONIZED PAPER CO. et al.

(Circuit Court of Appeals, Seventh Circuit. April 14, 1914.)

No. 2056.

PATENTS (§ 328*) — INFRINGEMENT — MACHINE FOR COATING PAPER WITH CARBON.

The Weeks patent No. 665,648, for a machine for coating paper with carbon, construed, and *held* not infringed by a machine in which the rolls are heated.

Appeal from the District Court of the United States for the District of Indiana; Albert B. Anderson, Judge.

Suit in equity by the General Manifold & Printing Company against the Carbonized Paper Company and Thomas T. Butler. Decree for defendants, and complainant appeals. Affirmed.

Taylor E. Brown and Clarence E. Mehlhope, both of Chicago, Ill. for appellant.

Joseph A. Minturn, of Indianapolis, Ind., for appellees.

Before BAKER, KOHLSAAT, and MACK, Circuit Judges.

---

MACK, Circuit Judge.   On this appeal from the decree of the District Court, dismissing for want of equity appellant's bill of complaint alleging the infringement of Weeks patent No. 665,648, it is necessary for us to consider but one of the several defenses relied upon by the appellees, viz., that of noninfringement.

The patent in question relates to a machine for coating paper with carbon and similar materials, a machine designed to produce paper carboned on one side but, unlike the ordinary interleafing carbon paper, available on the other side for writing or printing.   The ordinary carbon paper in common use, like typewriter carbons, has a comparatively thick layer of soft carbon, so that, inserted between two sheets of paper, it may be used over and over again to reproduce on the bottom sheet what is written on the top sheet.   The top side of the carbon paper is unavailable for writing upon either because it, too, is carboned or because, the paper being thin, the carbon shows through.

Weeks appreciated the commercial possibilities of utilizing the back of ordinary writing or printing paper as the transfer medium, especially if only one or two reproductions were needed, as for books of sales slips.   The difficulties to be overcome were the smudgy character of the soft carbon, which would tend to spoil the writing side of the paper when the two sides were necessarily brought into contact on being wound in rolls, the spreading or infusing nature of a liquid or liquified carbon, which would tend to cause the fiber of the paper to be so thoroughly permeated as to color and impregnate the opposite side of the sheet, thereby rendering it practically useless for writing or printing, and the economic waste of a thick layer of carbon when designed for use in only one transaction.

Weeks endeavored to meet these difficulties by substituting a practically-hard carbon for the liquid theretofore commonly employed.   The claims in this patent as finally allowed, contrary to their first and rejected form, specifically characterized the carbon to be supplied by this machine to sheets of paper, as "practically hard."

The claims charged to be infringed are as follows:

"1. In a machine for supplying practically-hard carbon to sheets of paper, the combination of means for initially supplying practically-hard carbon to a sheet of paper, and devices for spreading and devices for affixing the carbon on the surface of the paper, substantially as described."

"9. In a machine of the class described, the combination of a roll receiving a supply of carbon contacting on one side with the carbon and on the opposite side with a sheet of paper for transferring and rolling onto the paper a coating of carbon, a second roll beneath the transferring-roll for the passage of the paper between the rolls to be contacted by the transferring-roll and means operating on the paper after it leaves the carbon-roll for uniformly and evenly spreading and permanently affixing the carbon on the paper, substantially as described.

"10. In a machine of the class described, the combination of a roll receiving a supply of carbon contacting on one side with the carbon and on the opposite side with a sheet of paper for transferring and rolling onto the paper a coating of carbon, a second roll beneath the transferring-roll for the passage of the paper between the rolls to be contacted by the transferring-roll, means operating on the paper after it leaves the carbon-roll for uniformly and evenly spreading and permanently affixing the carbon on the paper, and means for polishing and hardening the carbon surface of the paper after it leaves the spreading and affixing means, substantially as described."

"28. In a machine for supplying practically-hard carbon to a sheet of paper the combination of means for initially applying the carbon to the surface of the paper, and devices for spreading and affixing the carbon on the surface of the paper.

"29. In a machine for supplying practically-hard carbon to the surface only of the sheet of paper, the combination of means for initially applying the carbon to the surface of the paper, means for spreading the carbon evenly over the surface, and means for affixing the carbon to the surface so that a practically-hard carbon surface will be formed on the surface only of the paper.

"30. A machine for forming a practically-hard carbon surface on paper, comprising means for initially supplying carbon to the surface of the paper, and means for affixing the carbon on the sheet to form a practically-hard surface.

"31. A machine for making hard carbon surfaced paper, comprising a paper feed, means for applying a practically-hard carbon to one surface of the paper and a device for affixing the carbon to the paper to form a hard carbon-coated surface, substantially as described."

Figure 3 of complainant's patent drawings is as follows:

In the specifications, the invention is thus described:

"The cake of carbon is arranged, preferably, in a pocket, $C'$, in such position that it may be fed onto the paper as it enters the machine by means of a friction supplying-roll, $c$. This carbon-supplying roll during its rotations contacts the lower surface of the cake of carbon, and transfers or carries a certain amount of it to the paper and rolls it onto the surface. This roll, however, may be dispensed with and the cake of carbon be held in such a manner that it may be contacted directly with the surface of the paper, and its or an additional weight, spring, or other desirable means be used to hold it in contact with the paper for the purpose of regulating the supply. Arranged directly under this carbon-supplying roll is a second roll $D$, which rotates with the carbon-supplying roll and is adjustably mounted in bearings $d$, so that its position or the space between it and the carbon-roll may be regulated.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

"Describing the distributing mechanism, it consists of two sets of rubbers, $G$ and $G'$, which are made in a shape resembling the ordinary blackboard-eraser and which are provided with a cover $g$, of flannel, chamois, or similar material. These rubbers are moved back and forth transversely across the-

paper while it is passing through the machine by means of reciprocating rod-

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"Describing the polishing or hardening mechanism, I provide a rotating shaft *H* and mount it in suitable adjustable bearings on the bed of the machine. This rotating shaft carries a set of wings *h*, extending radially therefrom and arranged diagonally with relation to the axis of the shaft in such a manner as to meet at or near the center and form obtuse angles.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"These wing polishers are coated or covered with flannel, chamois, or similar material, and are revolved at a high rate of speed in such a manner as to permanently affix or harden the exposed surface of the carbon coating, so as to minimize the danger of disfiguring the adjacent sheets of paper.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"During the operation of rubbing and polishing, and owing to the friction force exerted on the paper the paper is liable to become heated and, as a consequence, ruptured or destroyd, and the heat also interferes with the coating of the carbon. In order to remove this objection, I provide the bed of the machine with a water-jacket, *W*, and provide it with supply and exhaust pipes, *w* and *w'*, so that a constant circulation of water may be had whenever it is desirable or necessary, and thus keep the temperature of the paper as uniform as possible."

While the parties are agreed that all of the claims in question are for substantially the same subject-matter, a combination of carbon-applying means, carbon-spreading means, and carbon-affixing means, they disagree as to the condition in which, and therefore the devices by which, the practically-hard carbon must be applied, spread, and affixed under the patent in question. Complainant contends that while the carbon must be initially hard, like a cake of soap, the patent is broad enough to cover means and devices for softening it or keeping it soft while removing the necessary portion from the cake and affixing, spreading, or polishing it on the paper, that is, that the devices may be either solid cold rollers or hollow rollers supplied with steam heat. The basis of this contention is that the cooling water-jacket, as described, has no connection with the first element in the combination, the means for originally supplying the carbon to the paper, that, moreover, it is only a preferential, but not an essential, attachment to the distributing and polishing devices, and that, therefore, the invention does not necessarily contemplate counteracting the heat, with its consequent softening of the hard carbon, produced by friction in the very process of separating it from the cake and transferring it to the paper.

The evidence demonstrates that the art of coating only one side of paper or other goods is old, that commonly this coating material was a liquid, and that in the earlier machines, if wax, paraffin, or other nonliquid material was to be used, either it or the goods, or both, were heated during the transferring and affixing process.

The file wrapper and contents show that the applicant, in answer to references cited by the examiner, distinguished his machine on several occasions from earlier inventions by the assertion that the latter, unlike his device, utilized steam heat to make or keep the coating material liquid.

215 F.—46

The board of examiners in chief said, in regard to the MacBrair patent No. 532,172, relied upon by the examiner but rejected by them on appellant's appeal:

"The calendar rolls, which are presumably heated rolls, revolve in the wrong direction. * * * The heat, as it is stated, would be detrimental to the process, even though the rolls rotated in the proper direction."

It is apparent that in their opinion Weeks' invention was for a machine designed to transfer to paper carbon that was not only initially practically hard, but that remained in this condition during the entire operation of supplying, distributing, and polishing it.

In our judgment, both the language of the patent and the history of the claims in the Patent Office indicate clearly that the means and devices covered thereby are only such as will produce this result without steam or other heat, and that the applicant intended so to limit his invention in order to avoid the charge of anticipation.

Whether or not such a machine, designed to prevent the carbon permeating the reverse side of the paper by supplying, spreading, and rubbing it in in a cold, hard state instead of in a warm, soft condition, could be successfully operated is not the question now before us; if it were, the fact that no witness has testified to seeing a machine constructed in accordance with the patent in suit, and that the machine actually used by complainant is heated, would be significant. It becomes unnecessary, too, to inquire into the validity of the claims if they were given the broad construction contended for.

We come to a consideration of defendant's machine, in order to determine whether or not it infringes on the patent in suit. While Weeks obtained, on the very same day on which the patent in question was issued, letters patent covering the carbon paper, this latter patent is not in any manner in question in this case, and, so far as the patent in suit is concerned, defendants were free to make a noninfringing machine designed to produce the identical paper.

Their machine is shown in the exhibit as follows:

It is described by defendants' expert in these words:

"There are three heated rollers arranged with their axis in a vertical plane. These are represented by *1*, *2*, and *3* at the right of the diagram. There is a fourth roller, marked '*4*,' a short distance to the left of the rollers *1*, *2*, and *3*, and there is a roller, *11*, at the left of the machine as shown in the diagram. Above this latter roller is a brush, *12*, revolving in the direction of the motion of the paper and acting in conjunction with the roller *11* to draw the paper through the machine. There is a roll of paper, *5*, from which the paper is fed and a roll, *14*, upon which the coated paper is wound. The paper passes from the roll *5* around the lower roll *3* and under the roll *2*, contacting something over 180 degrees of the periphery of the roll *3*. It then passes under the roll *4* over the roll *11* and down to the roll *14*, upon which the coated paper is wound. The carbon is applied to the surface of the upper roll *1*, and is conveyed by that roll and the roll *2* to the paper surface between the roll *2* and the roll *3*. The heat of the rolls melts the carbon so that it is applied to the paper in a liquid form. The roll *4* revolves in the opposite direction to the motion of the paper under it, and its surface takes up the excess of carbon deposited on the paper by the roll *2* and carries it upward. Above the roll *4* is a knife or scraper, *15*, which extends along and in contact with the surface of the roll *4* at the top of the roll. By this knife the carbon taken up from the paper by the surface of the roll is scraped off. This scraper takes off almost all of the carbon, but, owing to imperfections of workmanship, a little passes under the scraper and is deposited on the surface of the paper loosely beyond the roll. The brush *12* removes this loosely deposited carbon that passes under the edge of the knife *15*."

The essential differences, in our judgment, between the machine actually used by defendants and the machine protected by complainant's patent are these: While each of them starts with a cake of practically-hard carbon, defendants cause this carbon to be supplied to the paper in a hot, and therefore liquified form; complainant in a cold, hard form. So far as the first element of the combination is concerned, the means for supplying practically-hard carbon to the paper, complainant's patent contemplates a cold roller to remove "a certain amount" of it, "the correct amount," as its expert testifies, and to transfer this in the same hard, cold condition to cold paper; defendants, on the other hand, use a steam-heated roller to melt off an excess supply of it and to transfer it in a liquid form to paper heated by passing over a hot roller.

Complainant's second element, the means of spreading the carbon evenly over the paper, is essential to produce the desired result because of the very hardness of the cold carbon and its resulting failure, in the first operation, to spread itself evenly. Defendants' second element, as indicated by the samples of paper introduced in evidence, showing the condition of the carbon after each of the separate stages in its passage through the machine, is not a spreading or distributing device, but a device, a fourth roller with a scraping knife attachment, for removing the excess liquified carbon and removing it quickly enough after the initial application to obviate the danger of its permeating both sides of the sheet. It may be that the roller also tends to spread the carbon more evenly, but, in our judgment, its essential function is to take up the excess carbon, which the scraping knife then detaches from it on each revolution. This roller in the defendants' machine is also heated in order to keep the carbon liquified whereas, not only is complainant's spread-

ing or distributing means or device cold, but even the friction-produced heat is counteracted by the water jacket.

The third element in complainant's combination, the hardening and polishing means, has for its function the hardening and polishing of the carbon as stated in the specifications, and in no sense, as now claimed, the brushing away of loose particles of carbon. There is no intimation in the patent itself or in the file wrapper that this third element includes or was intended to include means for brushing away loose carbon as well as for thoroughly hardening and polishing the thin layer of carbon as spread out and distributed by the second element.

Defendants' machine, on the other hand, has not a buffer or polisher but a brush with hard bristles, designed to remove such loose particles of carbon as may have passed over the fourth roller and not have been completely removed therefrom by the scraping knife. These amounted to a quart and a half in a 10-hour run, coating 100,000 lineal feet of paper. The evidence shows that in the working of the apparatus the ends of the bristles of this brush gather nodules of hard carbon upon them. This in itself would demonstrate that this bristle brush was not adapted primarily to harden or polish, and that any such effect is merely incidental.

Without, therefore, in any manner considering the defenses of invalidity because of anticipation, aggregation, and functional character of the claims, and confining ourselves solely to the defense of noninfringement, we are of the opinion that this defense has been successfully maintained, and that the decree must therefore be affirmed.